UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOY ZELIKOVSKY, PsyD, Individually and on behalf of others similarly situated, | § § § | |
| | § | CIVIL CASE NO. |
| Plaintiff, | § § | 3:23-cv-02624-N |
| | § § | |
| | § | |
| INTERNATIONAL ASSOCIATION OF EATING DISORDER PROFESSIONALS' FOUNDATION, INC, a California Corporation, BONNIE HARKEN, JOEL JAHRAUS, DENA CABRERA, and RALPH CARSON, | § § § § § § | **SECOND AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |
| | § | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | § § | |

Comes now, Joy Zelikovsky, PsyD, ("Plaintiff") Individually and On Behalf of Others Similarly Situated, who file this Second Amended Class Action Complaint against the International Association of Eating Disorders Professionals Foundation, Inc. ("iaedp"), Bonnie Harken ("Harken"), Joel Jahraus ("Jahraus"), Dena Cabrera ("Cabrera") and Ralph Carson ("Carson") [or hereinafter referred to collectively as "Defendants"] as follows:

<u>**SUMMARY OF THE ACTION**</u>

**1.** Defendant iaedp, by itself and through its alter ego, Defendant Harken established and maintains an illegal 100% monopoly over the board certification process regarding the care and treatment of eating disorders. In order to acquire and maintain board-certification, eating disorder specialists are required to maintain membership in iaedp

and pay annual membership dues to iaedp. In addition, and depending on the type of certification, those who are board certified must also pay annual supervision fees and certification dues and fees.

**2.**     All board-certified specialists are also required to attend in person, iaedp's annual symposium held in either Orlando, Florida or Palm Springs, California once every four years.

The aforementioned conduct constitutes an unlawful tying arrangement and violates federal and state anti-trust laws.

**3.**     Plaintiff and the Plaintiff Class Members are dues paying members of iaedp and are board certified in eating disorders. Plaintiff and Plaintiff Class Members sustained actual damages proximately caused by Defendants' monopoly of the certification process and Defendants' other fraudulent conduct.

**4.**     As such, Plaintiff seeks class certification on behalf of all persons similarly situated who are or were dues paying members of iaedp and are or were iaedp certified in eating disorders. Plaintiff and the Class Members allege that Defendants fraudulently operated iaedp, engaged in acts constituting cronyism, tax evasion, engaged in a civil conspiracy, engaged in fraud through non-disclosure, violated antitrust laws by through an unlawful tying arrangement, and violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). Plaintiff on her own behalf and on behalf of class members, seek a return of all monies paid by the Class Members for their annual membership dues, dues and fees paid for iaedp certification, seek the payment of attorney's fees, treble damages, exemplary damages and for whatever other relief to which Plaintiff and the Plaintiff Class are entitled.

## PARTIES

**5.**     Plaintiff is a resident of the State of Connecticut.

**6.**     Defendant iaedp is a 501(c)(3) not for profit entity organized under the laws of the State of California. Defendant iaedp has been assigned counsel and a copy of this Complaint will be served upon said counsel pursuant to Fed.R.Civ.P. 4.

**7.**     Defendant Harken is an individual residing in the State of Illinois. Defendant Harken has appeared in this matter through counsel who will be served with a copy of this Complaint pursuant to Fed.R.Civ.P. 4.

**8.**     Defendant Jahraus is an individual residing in the State of Florida. Defendant Jahraus has been assigned counsel and a copy of this Complaint will be served upon said counsel pursuant to Fed.R.Civ.P. 4.

**9.**     Defendant Cabrera is an individual residing in the State of Arizona. Defendant Cabrera has been assigned counsel and a copy of this Complaint will be served upon said counsel pursuant to Fed.R.Civ.P. 4.

**10.**     Defendant Carson is an individual residing in the State of Alabama. Defendant Carson has been assigned counsel and a copy of this Complaint will be served upon said counsel pursuant to Fed.R.Civ.P. 4.

## JURISDICTION

**11.**     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this proceeding is a class action lawsuit as defined under 28 U.S.C. § 1332(d)(1)(B), the amount in controversy collectively for the class members exceeds $5,000,000 and at least one member of the proposed class is a citizen of states different than all named Defendants.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United

States. Plaintiff asserts a claim arising under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367 because the state common law and statutory claims alleged herein are so related to the federal claims that they form part of the same case or controversy.

**12.**     Venue is proper in this district pursuant to 42 U.S.C. § 1391(b) because Defendant iaedp[1] actively conducts business in this district; the individual defendants are all directors on the Board of Directors of the DFW Chapter of iaedp, an organization which has its principal place of business in this district; Defendant iaedp entered into contracts with hundreds of residents in the Northern District of Texas, to wit: the DFW Chapter of iaedp and its members. Defendant iaedp solicits and receives revenue from residents in the Northern District of Texas; Defendant iaedp solicits and requires persons who reside in the Northern District of Texas to attend its annual symposiums and numerous board-certified eating disorder specialists reside in the Northern District of Texas; Defendant iaedp engaged in its unlawful tying arrangement with numerous residents in the Northern District of Texas. As such, substantial parts of the events or omissions giving rise to the claims in general and Class Members' causes of action arose in this district.

## **Background Facts**

**13.**     Defendant Harken took over *iaedp* in 2002.   During the following 21 years, Defendant Harken acquired and then through subterfuge, deceit and through a carefully crafted conspiracy with the other defendants, obtained complete control not just

---

[1] Whenever reference to Defendant iaedp is made in this Complaint, it is meant to include both itself and its alter ego, Defendant Harken.

over *iaedp* and its "independent" iaedp corporate chapters, but also the manner in which Defendant iaedp operates the iaedp certification[2] program.

14.     Defendant Harken's stewardship over iaedp has been marked by ethically questionable and illegal conduct. The purpose of Defendant Harken's illicit conduct was to unjustly enrichen herself at the expense of a non-profit organization which was supposed to be dedicated to the research, education and understanding of eating disorders.

15.     Eating disorders have the second highest mortality rate among all mental illnesses. One person dies every fifty-two (52) minutes as a direct result of eating disorders. Eating disorders are a complex medical/mental illness with biological, genetic and societal components. Research continually grows and gains insight into the risk factors that contribute to this illness. These risk factors thus far are multifactorial and include factors, such as genetics, temperament, biology, trauma, and coping mechanisms. Because of the evolving nature of eating disorders, the understanding and utilization of "evidence-based" treatment is paramount and is the best recourse for the growing understanding of the causes and manifestations of this disease and improved treatment regiments.

16.     The complexities and multivarious elements of this illness require that medical and mental health practitioners who wish to specialize in eating disorder treatment receive the best education and information possible. So too, the process to acquire certification demonstrating expertise in treating eating disorders must be held to the highest standard possible. Establishing and maintaining this highest standard should be overseen and

---

[2] Certification in the mental health field is usually overseen by an independent organization and is based on input and expertise from collaborative experts. The certification process regarding eating disorders is based strictly on Ms. Harken and iaedp. Therefore, eating disorder certification will be referred to throughout this Complaint more accurately, as "iaedp certification."

regulated by an independent, unbiased administrative or private organization free from any financial ties to that standard. Regarding iaedp certification, this type of oversight and regulation does not exist.

17.     There is only one nationally recognized certification credential for eating disorders. This credentialing was generated by, issued by and overseen exclusively by Defendants Harken and iaedp. In the United States, medical professionals and mental health practitioners who wish to obtain certification in treating eating disorders are first required to obtain and then maintain annual membership in iaedp.

18.     In the past, iaedp's board certified specialist designations included:

- Certified Eating Disorders Specialist (CEDS), which applied to licensed therapists, medical doctors, and nurse practitioners;

- Certified Eating Disorders Registered Dietitian (CEDRD), which applied to registered dietitians;

- Certified Eating Disorders Registered Nurse (CEDRN), which applied to registered nurses, and;

- Certified Eating Disorders Creative Arts Therapist (CEDCAT), which applied to Music, Art, Recreation and Dance/Movement Therapists.

19.     Defendant iaedp eliminated these designations and now just have a general certification designation, Certified Eating Disorder Specialist or "CEDS". The iaedp certification process and program also have undergone a number of other questionable changes.

20.     The certification core course content and exam questions are allegedly overseen by an iaedp committee. The certification committee members review applications to assess if an applicant meets (or exceeds) iaedp's requirements. Providers who qualify for

credentialing do so through one of two routes: Equivalency or Traditional. Each of those two tracks have their own separate study, patient consultation, supervision and demonstrated expertise requirements.

<u>Certification requires mandatory membership in iaedp and in person attendance at annual symposiums.</u>

**21.**     Iaedp is the only organization offering certification in the care and treatment of eating disorders. As such, iaedp has a complete monopoly pertaining to eating disorder certification, its process and maintenance. All board-certified eating disorder specialists are required to maintain their membership in iaedp and to pay annual membership dues to iaedp. In addition, and depending on the type of certification, those who are board certified must also pay annual supervision fees and membership fees.

**22**.     A failure or refusal to pay any of these fees results in iaedp cancelling or denying iaedp certification.

**23.**     To maintain iaedp certification, eating disorder professionals are required to attend, in person, iaedp's annual symposium once every four (4) years. These symposiums alternate between a resort location in Palm Springs, California and a resort location in Orlando, Florida.

<u>Iaedp's Certification Program is designed to be a revenue generating program for Defendant Harken</u>

**24.**     On or about December 17, 2023, an iaedp member started a petition calling for the removal of Defendant Harken and the disassociation of the certification process from iaedp.  A true and correct copy of said petition is attached hereto as Exhibit "1." Prospective class members commented on the petition. These comments include the

costs for obtaining certification and maintaining membership in iaedp. This comment utilized 2019 statistics. The financial obligations were listed as follows:

     A.       Annual membership fee: $195;

     B.       Certification application fee: $150;

     C.       Certification renewal fee due every 2 years: $150;

     D.       Attendance at an IAEDP conference required every 4 years -- 2019 Rates $725;

     E.       Hotel: $330/night;

     F.       Flight: $300+;

     G.       Meals: $60/day+;

     H.       Lost Income from time off: $1200+;

**Total Conference cost: $3395;**

     I.       2,500 supervised practice hours over at least 2 years: $150/hour x 21 hours with approved supervisor = $3150;

     J.       $400 for core courses;

     K.       14 required tests: $350+;

     L.       Exam Fees $100.00

**Total Cost to become iaedp Certified: $4150**

Total Annual cost for membership including IAEDP conference and certification renewal fee: $3,800 ($1,118.75/year if conference and renewal fee are divided into per year totals)

Total cost to obtain and maintain certification and membership: $7950.

**25.**    Since membership fees and symposium fees are not reasonably related nor an integral part of iaedp certification, the mandatory inclusion of same is merely to increase the coffers of iaedp and enrichen its managing director and alter ego, Defendant Harken.

In an affidavit filed in this case, Defendant Harken admitted that symposium attendance was designed to financially support iaedp[3]. In said affidavit, Defendant Harken stated, "<u>The purpose of the symposium attendance requirement is to keep certified members of iaedp invested in the organization</u>, facilitate collaboration with other highly qualified professionals, and streamline the CE process." *Id.* [emphasis added]

**26.**    According to Defendant Harken, board certified eating disorder specialists number at least 1,200 annually who have been required to purchase iaedp membership. From 2017 – 2021, iaedp received a total of $516,003 in certification fees.

**27.**    In addition, on iaedp's Form 990 tax filings, Defendant Harken received (not including payment of alleged expenses and bonuses) $617,000 from 2018 through 2021. Further, Defendant Harken, as an alleged independent contractor, has signatory authority over all of iaedp's bank accounts.

<u>Defendant Harken's stewardship over iaedp has been continually marked by ethically questionable and illegal conduct.</u>

**28.**    Defendant Harken made material misrepresentations on *iaedp*'s Form 990 tax filings from 2017 to present. To this end, Defendant Harken represented that she works an alleged 40.00 hours per week, is listed as an officer, but takes no salary[4]. In addition,

---

[3] See, Harken Affidavit in Defendant Harken's Appendix in Support of Motion to Dismiss
[4] On iaedp's latest Form 990 tax filing, Defendant Harken changed this hourly number to 32 hours instead of 40 hours.

her dissolved, wholly owned management company, Crossroads Programs, Inc. purportedly had a consulting agreement with *iaedp* and was paid a base income of $156,000.00.

However, Defendant Harken admitted through prior counsel that her corporation was and has been dissolved since June 6, 2016.  Defendant Harken's explanation was that she in fact, was operating as a "sole proprietor" and independent contractor. Therefore, iaedp's Form 990 tax returns are incorrect beginning in 2017. But the troubles and issues of Defendants iaedp and Harken are much more extensive.

**29.**　Notwithstanding the fact that Defendant Harken has this alleged consulting agreement with Defendant iaedp, on September 22, 2023, Defendant Harken made material misrepresentations on Defendant iaedp's Annual Registration Renewal Report to Attorney General of California. ("Annual Report") *See*, Exhibit 2. On the Annual Report, the following question was included: "During this reporting period, were there any contracts, loans, leases or other financial transactions between the organization and any officer, director or trustee thereof, either directly or with an entity in which any such officer, director or trustee had any financial interest?" Defendant Harken checked the No box.

And yet, on the Annual Report, Defendant Harken represented that she was an officer and that her defunct corporation, Crossroads Programs, Inc. was paid management fees by Defendant iaedp in the amount of $156,000.00.  *Id.*

Defendants Harken and iaedp violate California tax laws.

**30.**　Iaedp was organized in the State of California in 1996. According to iaedp's records, it has ZERO full time paid employees. No officer, employee or director has any reportable compensation from iaedp. However, Defendant Harken maintains that she is an

independent contractor of iaedp and not an employee. The facts do not support Defendant Harken's sworn statement.

31.     The State of California utilizes the "ABC test" to determine if workers are employees or independent contractors. California law presumes that a worker is an employee and not an independent contractor. The employer (in this case, iaedp) has the burden to prove a worker is in fact, an independent contractor. Under the ABC test, a worker is considered an employee and not an independent contractor, unless the employer satisfies all three of the following conditions:

- The worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact;

- The worker performs work that is outside the usual course of the hiring entity's business; and

- The worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

32.     Iaedp cannot satisfy even one of these criteria. Assuming *arguendo* that Defendant Harken was an independent contractor, she is performing all substantive work for *iaedp*. If allowable, that would result in a Board of Directors having no power and no authority over the only person acting in a full-time capacity. Further, to whom would this independent contractor, this dissolved corporation or sole proprietor or individual report and who would oversee her work?

33.     Defendant Harken, her dissolved corporation and sole proprietorship cannot show under any circumstances that she was performing work outside the usual course of business of an eating disorder organization. To the contrary. Defendant iaedp is the alter ego of Defendant Harken

**34.**   On iaedp's tax forms, Defendant Harken committed perjury and misrepresented Crossroad's status, misrepresented its existence, misrepresented that she was not an employee and illegally operated in the State of California. In iaedp's tax filing in California it reports that iaedp has zero paid employees and has not withheld any state income or any other related taxes.

**35.**   California requires employers to withhold state income tax from wages paid to employees and in most cases, to independent contractors. There are also three other state payroll taxes: State disability insurance, which are withheld from employees' wages; Unemployment insurance, which the employer pays; and Employment training tax, which the employer also pays. Upon information and belief, neither Iaedp nor its alter ego, Defendant Harken paid any of those taxes.

**36.**   When the California Franchise Tax Board conducts its investigation into iaedp, in all reasonable likelihood, it will assess past due taxes, penalties and interest from both iaedp and Defendant Harken. With iaedp's limited resources, this will in all reasonable probability, result in iaedp being forced to cease operations, including shuttering the certification program. This would result in devastating consequences to the eating disorder community. In addition, under the Employment Taxes and the Trust Fund Recovery Penalty, iaedp's Board of Directors could have joint and several liability for any taxes, penalties and interest due.

**37.**   In order to generate revenue, which such revenue was intended to only benefit Defendant Harken, Defendant Harken committed perjury on tax filings, committed tax evasion by knowingly and intentionally misclassifying herself as an independent contractor, accepted revenue from a non-profit organization to benefit her for profit entity

and operated a certification program that violates antitrust laws through an unlawful tying arrangement.

**38.**    Defendant Harken's iron fisted control over iaedp includes requiring at least twenty-nine (29) allegedly separate, "independent" iaedp corporate chapters to incorporate in the State of Illinois.

However, the only nexus these "independent" iaedp corporate chapters have with the State of Illinois is that Defendant Harken resides in Pekin, Illinois[5]. Defendant Harken is the Chairman of the Board of Directors for each of these 29 "independent" iaedp corporate chapters. The only other members of the Board of Directors of the "independent" iaedp corporate chapters are her co-Defendants Jahraus, Cabrera and Carson. Despite the fact that Defendant Cabrera is a resident of the State of Arizona, Defendant Jahraus is a resident of the State of Florida and Defendant Carson is a resident of the State of Alabama.

**39.**    However, the "independent" iaedp corporate chapter filings with the Illinois Secretary of State list these individual defendants' addresses as: P.O. Box 1295, Pekin, Illinois 6155. This P.O. Box is the principal business address for Defendant iaedp. Defendant Harken has custody and control over this post office box. By having exclusive control over the boards of directors for these "independent" iaedp corporate chapters, Defendant Harken maintains sole control over the manner in which iaedp, as state and national organizations operate.

**40.**    This sole control has resulted in grossly negligent oversight of the operations of the "independent" iaedp corporate chapters. Numerous mandatory filings and fees have not

---

[5] Defendant iaedp was organized under the laws of the State of California in 1996.

been paid resulting in several "independent" iaedp corporate chapters being placed in inactive or suspended status, including but not limited to:

A.      The California Attorney General listed Defendant *iaedp* as delinquent beginning on February 15, 2019. California law is strict in that delinquent organizations "may not operate or solicit for charitable purposes." "An organization that is delinquent, suspended or revoked is not in good standing and is prohibited from engaging in conduct for which registration is required, including soliciting or disbursing charitable funds." Defendants Harken and iaedp violated these laws;

B.      Defendants Harken, Carson, Cabrera and Jahraus as the board of directors of the "independent" corporate chapters located in San Francisco, Los Angeles and Orange County were grossly negligent in permitting those three chapters to go into "Franchise Tax Board" (FTB) suspension status, a status which those chapters still maintain.  As FTB suspended organizations, those three chapters are not allowed to conduct any legal business, do not maintain the right to use their business name and have had their tax-exempt status revoked in the State of California;

C.      The Puget Sound (State of Washington) Chapter was placed in an inactive status once in 2020, once in 2021 and once in 2022;

D.      The Southwest Washington Chapter was placed in an inactive status once in 2020 and again in 2022;

E.      The San Diego Chapter had its status placed in suspension pending status in 2021;

F.      The Maricopa County (Phoenix) Chapter was placed in a pending inactive status in 2021. In addition, in filings with the Arizona Secretary of State, this Chapter listed a director who is not on the Board of Directors;

G.     The South Carolina Chapter was never registered as a foreign organization authorized to conduct business in South Carolina;

H.     The Rhode Island Chapter was placed in a delinquency pending status in 2022;

I.     The Atlanta Chapter was never registered as a foreign organization in the State of Georgia and as such, does not have authority to conduct business in Georgia;

J.     At the time of this filing, thirteen (13) chapters were listed as "Not in Good Standing" on the Illinois Secretary of State website.

**41.**    When Defendant Harken's corruption and fraud began to be exposed, a number of iaedp "independent" chapters made the decision to disband or dissolve. These chapters include, but are not limited to, the New Haven Chapter, the St. Louis Chapter, the Denver Chapter, the Baltimore Chapter, the Phoenix Chapter and the Los Angeles Chapter. Upon information and belief, other chapters have begun to discuss similar dissolutions.

As these chapters petition to dissolve, Defendant Harken is making demand that all money in those corporate chapter bank accounts be turned over to her.

**42.**    To cover up her illicit business practices, Defendant Harken has not authorized nor allowed any CPA firm to conduct an independent audited financial statement for iaedp in over twelve (12) years.

**43.**    Further, Defendants Harken and iaedp violated, and continue to violate IRS rules and regulations pertaining to disclosure of financial and governing documents to the general public. On iaedp's Form 990 tax filings, the following language appears:

19. Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

Section O states:

| FORM 990, PART VI, SECTION C, LINE 19 | AVAILABLE UPON REQUEST FROM THE CORPORATE OFFICE. |
|---|---|

**44.**   Plaintiff's counsel made demand for the information set forth on Defendant iaedp's Form 990 tax filing on October 5, 2023. However, Defendant iaedp failed and refused, and continues to fail and refuse to date, to respond in any manner to said request.

### CLASS ACTION ALLEGATIONS

### THE CLASS

**45.**   Paragraphs 15 through 44 are hereby incorporated for all purposes.

**46.**   Plaintiff bring this action on behalf of herself, and all others similarly situated as a class action proceeding pursuant to Fed.R.Civ.P. 23. This action may properly be maintained as a class action under the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed class is ascertainable.

**47.**   Plaintiff seeks to represent a class defined as follows:

**All individual persons who became board certified through iaedp between January 1, 2017 to present and who also paid membership dues to iaedp and attended at least one national symposium during that time period.**

The proposed class is not limited to those persons who reside in the State of Texas but include those persons nationally and internationally wherever they may be located.

**48.**   Plaintiff and the Plaintiff Class all have common and general interests.  Further, the named Plaintiff reserve the right to modify the definition of the proposed class based on information that they or their counsel learn through discovery. The named Plaintiff

will fairly represent the interests of the class members involved.  The class meets all the requirements of Federal Rules of Civil Procedure 23 as follows.

<u>The Class Members Share Common and General Interests</u>

**49.**   The first prerequisite for a class action is that the Class Members share a common or general interest.  The members of the Class need not share all interests, but only a common interest.

**50.**   In this case, the common interests include, but are not limited to, the following:

A.   All Plaintiff Class Members paid membership association dues to iaedp;

B.   All Plaintiff Class Members attended in person at least one national symposium hosted by iaedp;

C.   All Plaintiff Class Members successfully completed iaedp's certification program;

D.   All Plaintiff Class Members became board certified by iaedp and paid fees and dues associated with said certification to iaedp;

E.   With regard to Defendants' liability, Plaintiff Class Members all sustained actual damages.

<u>Numerosity</u>

**51.**   The Class members are so numerous that joinder of all is impractical. According to Defendant Harken, iaedp annually has approximately 3000 members and 1200 members in the certification program.  Confirmation of the number and identity of the members of the class are readily determinable from the records of Defendants. Clearly, the numerosity element has been met.

<u>Commonality</u>

**52.**   There are questions of law and fact common to the proposed class that predominate over any questions affecting only the individual class members. The common questions of law and fact include, without limitation:

a.   Whether iaedp's eating disorder Board Certification Market and the Association Membership Market are separate product markets;

b.   Whether, during the relevant period, iaedp had market power in the eating disorder Board Certification Market;

c.   Whether, during the relevant period, iaedp had a monopoly in the eating disorder Board Certification Market through an illegal tying arrangement by conditioning eating disorder board certification on the purchase of annual membership in iaedp and attendance at its symposium;

d.   Whether iaedp's tying arrangement affected a substantial amount of interstate commerce and/or commerce in Texas;

e.   Whether iaedp's tying arrangement caused anticompetitive effects nationally and/or in Texas;

f.   Whether there were any procompetitive justifications for iaedp's tying arrangement;

g.   Whether iaedp's tying arrangement was primarily meant to drive revenue to Defendants;

h.   Whether Defendant Harken committed tax evasion;

i.   Whether iaedp's conduct violated 15 U.S.C. §§ 1, 2;

j.   Whether Defendants violated the Texas Business and Commerce Code § 15.05;

k.      Whether Defendants were unjustly enriched because of payments made by the Plaintiff Class;

l.      Whether Defendants engaged in a civil conspiracy, and;

m.     Whether Defendants violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

<u>Typicality</u>

53.   Plaintiff's claims are typical of the claims of each Class member.  Plaintiff's claim for damages is typical of the other damage claims sought for absent class members.

<u>Adequacy</u>

54.   Plaintiff will fairly and adequately represent and protect the interests of the Class Members. There are no conflicts of interest between the interests of Plaintiff and the other Class Members. Counsel representing Plaintiff are competent and experienced in class litigation.

<u>Superiority of Class Action</u>

55.   A class action is superior to other available means for the fair and efficient adjudication of this controversy. The members of the Class are so numerous that it is impracticable to bring all members before the court.  Individual joinder of all proposed Class Members is not practicable, and questions of law and fact common to the proposed class predominate over any questions affecting only individual members of the proposed class. Each member of the proposed class has been damaged, which such damages were proximately caused by Defendants, and are entitled to recovery of said damages.

56.   The Class Members have little incentive, if any, to prosecute their claims independently and would be unlikely to find counsel to represent them. Further, the Class Members, are located in many different states, and bringing all claims together in this

forum saves judicial resources. The only practical mechanism is for the Class Members to vindicate their rights through class treatment of their claims which is convenient, economical and consolidates all claims in a single suit, and serves to avoid a multiplicity of suits.

57.    Defendants have acted or refused to act on grounds that apply generally to the class, so that declaratory relief, statutory penalties, and awarding actual, treble and punitive damages is appropriate respecting the class as a whole. Class certification will allow those persons similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## VIOLATIONS OF THE SHERMAN ANTITRUST LAWS, 5  U.S.C. § 1 *et seq*

### Background Facts

59.    Paragraphs 15 through 58 are hereby incorporated for all purposes.

60.    Iaedp has a monopoly in the Eating Disorder Board Certification Market. This monopoly was obtained through the utilization of an unlawful tying arrangement which allowed Defendant iaedp to maintain its monopoly.

#### Mental Health Board Certification Market

61.    The Mental Health Board Certification Market consists of several organizations overseeing certification of medical and mental health care in the United States. The American Board of Professional Psychology ("ABPP") is the primary organization for Specialty Board Certification in Psychology. There are currently 15 Specialty Boards and 1 Subspecialty Board.

**62.** The ABPP was incorporated in 1947 with the support of the American Psychological Association. The ABPP is a unitary governing body of separately incorporated specialty examining boards which assures the establishment, implementation, and maintenance of specialty standards and examinations by its member boards. Through its Central Office, a wide range of administrative support services are provided to ABPP Boards, Board Certified Specialists, and the public. A Specialty is a defined area in the practice of psychology that connotes special competency acquired through an organized sequence of formal education, training, and experience.

**63.** The ABPP's specialty boards are Addiction Psychology; Behavioral & Cognitive Psychology; Clinical Child & Adolescent; Clinical Health; Clinical Neuropsychology; Clinical Psychology; Counseling; Couple & Family; Forensic Psychology; Geropsychology; Group Psychology; Organizational & Business; Police & Public Safety; Psychoanalysis; Rehabilitation; School Psychology and Serious Mental Illness.

**64.** Since 1933, The American Board of Medical Specialties (ABMS), has been awarding board certification and is the recognized leader in developing and setting the physician specialty certification gold standard in the United States. The ABMS consists of 24 Member Boards offering board certification in 40 specialties and 88 subspecialties. These Member Boards adhere to rigorous training and assessment standards.

Eating Disorder Board Certification Market

**65.** Defendant Harken through Defendant iaedp, bypassed these established credentialing organizations and leveraged monopolistic power by conditioning acquisition and maintenance of iaedp certification (the "tying product") to membership in iaedp and attendance at iaedp's Annual Symposium (the "tied product").

**66.**   As a result, iaedp has been able to inflate the price it charges for membership in iaedp as well as the costs associated with certification, and has thereby earned, without any offsetting pro-competitive benefits, inflated revenues from membership dues, association fees and symposium fees and costs that Defendant iaedp and Harken would not otherwise have earned. Since at least January 1, 2016, iaedp has required all board-certified eating disorder specialists to purchase and maintain annual membership in iaedp and pay iaedp's annual membership dues in order to avoid iaedp's deactivation of their iaedp certification.

**67.**   There is no legitimate procompetitive justification, no medical or mental health justification, and no rational justification for iaedp's requirement that iaedp certified eating disorder specialists purchase annual membership in iaedp or to require these specialists to attend iaedp's Annual Symposium. The costs of annual membership dues incurred by Plaintiff and board-certified eating disorder specialists to maintain their board certifications are in addition to the examination, processing and administrative fees that each board-certified specialist already pays to iaedp as part of the initial certification process.

**68.**   The cost of iaedp membership is also in addition to the annual registration and certification fee that each board-certified eating disorder specialist already pays to iaedp to maintain his or her certification. Iaedp's requirement that certified eating disorder specialists purchase iaedp membership annually, and pay the corresponding annual membership fee, has no bearing on, and has no relationship to, a specialist's competency to practice mental health/medical care in a specialty area.

**69.**   Iaedp has approximately 3,000 members. Of these members, approximately 1,200 are currently board certified. Iaedp's membership fee requirement has no legitimate

purpose and does nothing but produce additional revenue for iaedp and *ipso facto*, Defendant Harken, exceeding $230,000 dollars in annual certification and institute fees and dues.  Thus, by virtue of the unlawful tying arrangement reducing choice, Plaintiff and board-certified eating disorders specialists have been forced to purchase and maintain iaedp membership and to attend the annual symposium.

**70.**     Defendant Harken admitted, in an affidavit filed in this case, that one of the reasons attendance at the annual symposium was required as to keep board certified specialists "invested in iaedp." This attendance requirement is a money grab for Defendant iaedp, nothing more.

<u>Iaedp's unlawful Tying Arrangement has Foreclosed Competition, Raised Prices and Reduced Consumer Welfare in the Eating Disorder Membership Market</u>

**71.**     Upon information and belief, no other professional physician association conditions board certification on membership in a specific organization. In fact, the tying arrangement at issue in this case, was the subject of class-based litigation in 2016. That case involved the American Osteopathic Association. The parties entered into a settlement agreement whereby the AOA was divested of the certification process with membership no longer being a requirement and AOA agreed to pay damages on a class wide basis.

**72.**     By requiring membership as a condition for board certification, iaedp has reduced the number of individuals considering purchasing membership in other professional eating disorder associations such as the Academy for Eating Disorders and the National Eating Disorder Association.  This has erected market-wide barriers to entry in the Eating Disorder Membership Market, as potential competitors of iaedp are dissuaded from

entering the market because they cannot be guaranteed a share of the market sufficient to viably compete.

**73**    Iaedp's tying arrangement has reduced competition in the Mental Health Membership Market, as other rival associations have lost potential members, and the pricing and output of market participants is not reflective of a competitive market. The diminished competition in the Mental Health Membership Market and the exercise of monopolistic market power by iaedp have harmed the prospective Class members who are consumers and decreased consumer welfare. By deterring entry and raising its rivals' costs, the actions of iaedp have resulted in iaedp's increased prices and increased prices in the Eating Disorder and Mental Health Membership Markets as a whole.  This increased pricing, without any offsetting pro-competitive benefit, has reduced consumer welfare in a manner in which the antitrust laws are intended to protect.

COUNT ONE

**Iaedp's Monopoly of the Eating Disorder Board Certification Market Violates 15 U.S.C. § 2**

**74.**    Plaintiff realleges and incorporates by reference paragraphs 15 – 73 herein as if set forth verbatim.

**75.**    Section 2 of the Sherman Act makes it unlawful for an entity to "monopolize." 15 U.S.C. § 2. Monopoly power is "the power to control price or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). To prove monopolization, a plaintiff must show: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product,

business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

76. At all material times, Defendant iaedp has had 100% monopoly power in the distinct product market of Eating Disorders Board Certification Market. The geographic market is nationwide and Defendant iaedp claims to have chapters active in 28 different states. There are no nationally recognized alternatives for eating disorder board certification available to eating disorder specialists.

77. Defendant iaedp has market power because it controls all aspects of eating disorder board certification, including but not limited to, standards, criteria, protocols, requirements and financial demands for obtaining and maintaining board certification for eating disorders.

78. Defendant iaedp has been able to maintain this monopoly through the use of its illegal tying arrangement. By conditioning iaedp certification on continuous membership in iaedp and the cost of iaedp's annual membership dues, as well as mandatory in person attendance at its symposium, iaedp perpetrated an unreasonable restraint of trade that constitutes a *per se* violation of 15 U.S.C. § 2. Defendant iaedp's monopoly and restraint of trade also constitute violations of 15 U.S.C. § 2 under the rule of reason analysis.

79. iaedp's illegal tying arrangement also foreclosed competition in the Mental Health Membership Market, and more specifically, the Eating Disorder Membership Market resulting in market-wide pricing and product offerings that are not reflective of a competitive market.

80. Prospective class members have publicly expressed their dismay and dissatisfaction with Defendants Harken and iaedp, including their concern about the

illegal tying arrangement, and demanded change. In an online Petition·, the following comments were made:

A.      "I want the CEDS credential to mean something and to be associated with an organization that is upstanding. IAEDP needs change." – Rebecca A.;

B.      "I am currently a CEDS-C and have continued to stay credentialled to support the future of the eating disorder field. But at this point the lack of commitment to the betterment of the field, the racism and fat phobia embedded within the organization as well as the inappropriate certification process that requires attendance to conference and membership dues needs to stop." – Gina M.;

C.      "I have dedicated my career to the treatment of eating disorders and have worked incredibly hard to earn my certification. Over the past few years, it's become harder and harder to support the actions of iaedp as they do not represent the beliefs and values of their members. With a change of leadership, hopefully iaedp can again become an organization we can be proud to support, and the hard-earned credentials of certified members can mean something again." – Tracy B.;

D.      "Since iaedp has been the only way to attain the only nationally recognized certification indicating competence in treating eating disorders, I chose to dive in, wanting to fix what so many of us said we were not satisfied with/saw as needing improvement, particularly in the core courses and CEDS process. (When the public hits the crisis of an eating disorder, the LAST thing they need to do is have to vet providers' competence. I have always seen the CEDS as a way of assuring public safety eventually if it could improve its contents, process, and presentation). ... I have now given thousands of hours to this org and the CEDS only to feel defeated, sad, and tired. I've been stumped about why things I and others saw as basic got roadblocked or ignored so often. At this

point, it seems to me that iaedp may be being run for various people's personal agendas over the greater good—and that is what has broken my spirit the most. … However, the CEDS renewal already requires ED-specific CEs. So why the Symposium, too? Forcing people to attend online or in-person may stop some budding or genuine specialist clinicians from attaining their CEDS." – Alli S.;

E.       "I have been an RDN for 40 years, and over that time, I have seen the harm the field of nutrition, as well as eating disorder treatment, has caused. Weight stigma is still baked into this organization, as is gatekeeping, as the cost of becoming a CEDS is prohibitive to many highly qualified clinicians. I am letting my IAEDP certification lapse." – Erica L.;

F.       "I am not an IADEP member largely because of this requirement to attend symposium in order to maintain membership/credentialing. The cost and time is prohibitive especially for providers who are self employed." – Tori W.;

**81.**     As of the date of the filing of this Complaint, this petition has 261 signatures. This petition can be found at this site:

https://www.change.org/p/remove-bonnie-harken-as-managing-director-of-iaedp-change-certification-policy-ae99d4fe-d465-478b-85f7-9c714397fb5e

**82.**     According to Defendant Harken, board certified eating disorder specialists number at least 1,200 annually all of whom have been required to purchase iaedp membership. From 2017 – 2021, iaedp received a total of $516,003 in certification fees. As such, iaedp's unlawful tying arrangement has had a substantial impact on interstate commerce.

**83.**     As a result of iaedp's violation of 15 U.S.C. § 2, Plaintiff and Plaintiff' Class Members have paid iaedp supra-competitive prices for membership in iaedp, board certification and costs to attend iaedp's symposium.

**84.**   As recently as 2022, Defendant iaedp, through Defendant Harken had actual knowledge that their tying arrangement violated antitrust laws.   Defendant Harken had actual knowledge of the case, *Talone, et. al. v. The American Osteopathic Association*, Case No. 1:16-cv-04644 (D. N.J. Jun. 12, 2017) and the issues involving unlawfully tying association membership with board certification. Defendant Harken dismissed any concerns by attempting to justify that since the costs for association membership and certification had allegedly not increased, she and iaedp could have their tying arrangement.

**85.**   Defendant Harken chose to ignore the reality that in the *Talone* case, there was an alternative certifying organization. Iaedp has a 100% monopoly. Also, in the *Talone* case, the defendant did not require attendance at an annual symposium.

**86.**   Defendant Harken knew that her scheme violated the antitrust laws. The prospective Class Members have complained about certification and are demanding change. Defendant Harken gambled her organization would escape judicial scrutiny on the unlawful tying arrangement. Just like Defendant Harken gambled that her dissolved corporation and her status as an alleged independent contractor would escape judicial scrutiny. Just like Defendant Harken gambled her perjury on her Form 990 tax filings would not be discovered. Defendant Harken erred.

COUNT TWO

## **Restraint of Trade and Operation of a Monopoly in Violation of**
## **15 USC § 1**

**87.**   Plaintiff realleges and incorporates by reference paragraphs 15 – 86 herein as if set forth verbatim.

**88.**   Defendant iaedp possesses exclusive market power in the distinct product market of Eating Disorders Board Certification. The geographic market is nationwide.

**89.**   Defendant iaedp has market power because it controls all aspects of eating disorder board certification, including but not limited to, standards, criteria, protocols, requirements and financial demands for obtaining and maintaining board certification for eating disorders.

**90.**   Defendant Harken has market power because iaedp is her alter ego. Despite the fact that she fraudulently represents she is an "independent contractor," she controls all aspects of the operation of iaedp and all of the so-called, "independent corporate chapters."

**91.**   The remaining defendants conspired with Defendants iaedp and Harken to perpetuate this market power because they all serve on boards of directors of the so-called "independent corporate chapters." As such, Defendants Cabrera, Jarhaus and Carson control whether these chapters stay in existence and in good standing, the manner in which the corporate chapters financially contribute to iaedp to perpetuate the illegal monopoly and along with Defendant Harken, have exerted improper influence over the actions of Defendant iaedp. In the case of Defendant Cabrera, upon information and belief, she demanded and was afforded renewal of her board certification without having to comply with the requirements thereof.

**92.**     Defendants conspired to improperly enrichen iaedp and Defendant Harken through the operations of iaedp and its monopoly. Their actions and conduct have restrained trade by perpetuating this illegal monopoly in the eating disorder board certification market which resulted in suppressing all competition. This has necessarily made Defendants the exclusive source for providing specialization over the care and treatment of eating disorders.

Reputable, substantive eating disorder board certification criteria is crucially important in part, because the most recent, generally accepted statistics indicate the mortality rate of eating disorders is worsening[6].

**93.**     Each Defendant agreed to the goal of the conspiracy and each took specific overt acts in furtherance of the conspiracy.

**94.**     Defendants' acts, practices, and conduct violate Section 1 of the Sherman Act and proximately caused damage to Plaintiff and the Plaintiff Class Members by unlawfully restraining the eating disorder board certification market on a national level.

**95.**     All defendants benefit from the antitrust conspiracy by maintaining their exclusive monopoly of the eating disorder board certification market by ensuring no other entity can develop and provide competing services and allowing them to charge supracompetitive rates.

**96.**     Defendants' acts, practices, and conduct are per se unlawful; they are manifestly anticompetitive, reduce consumer choice, reduce the quality and standards of the applicable board certification requirements in the care and treatment of eating disorders and impose an improper financial burden on Plaintiff and the Plaintiff Class Members.

---

[6] The most recent independent domestic study indicates that eating disorders take the life of one person every 52 minutes.

**97.**   Defendants' anticompetitive conduct and conspiracy are also unreasonable and unlawful because they have significant anticompetitive effects and no pro-competitive benefits or justification.

**98.**   Plaintiff and the Plaintiff Class Members have been damaged because they have been subjected to improper financial impediments to obtain board certification. Various health insurance providers are requiring board certification for some treatment providers to be accepted "in plan" and without such, lower their payments on claims made. Ultimately, it is those millions of people suffering from eating disorders who endure the ramifications of Defendants' monopoly and restraint of trade since the most up to date knowledge and treatment regiments are limited to those Class Members who succumb to their unlawful conduct. Defendants' conspiracy also financially damage Plaintiff and the Plaintiff Class Members by requiring them to pay the amounts demanded by Defendants.

**99.**   Plaintiff and the Plaintiff Class Members' damages were and are a direct and proximate result of Defendants' anticompetitive conduct.

**100.**   The damages to Plaintiff and the Plaintiff Class Members are also injuries to the competitive process and are of the type that the Sherman Act is intended to prohibit. Defendants' anticompetitive conduct has reduced the availability of board certification in the eating disorders market by preventing access to the alleged, increased understanding of eating disorders and the treatment of this illness.

**101.**   Plaintiff and the Plaintiff Class Members have suffered and will continue to suffer monetary damages unless the Court enjoins Defendants' continuing violations and orders them to compensate Plaintiff and the Plaintiff Class Members.

COUNT THREE
(as to Defendants iaedp and Harken only)

**UNJUST ENRICHMENT**

**102.**   Plaintiff incorporates paragraphs 15 – 101 as if set forth verbatim.

**103.**   Plaintiff and the Plaintiff Class Members herein sue Defendants Harken and iaedp under the theory of unjust enrichment.

**104.**   As a result of Defendants' improper conduct described hereinabove, a monetary benefit was conferred upon Defendants Harken and iaedp, and they will continue to be unjustly enriched if allowed to retain the monies paid to these Defendants by Plaintiff and the Plaintiff Class.

**105.**   Plaintiff demanded that Defendants pay compensation for their improper and illegal conduct, but Defendants at all material times, failed and refused to pay for the damages they proximately caused.  As such, Plaintiff and the Plaintiff Class were damaged in an amount to be determined by the trier of facts.

COUNT FOUR

**CIVIL CONSPIRACY**

**106.**   Plaintiff incorporates paragraphs 15 – 105 as if set forth verbatim.

**107.**   All Defendants created and then perpetuated an enterprise designed to fraudulently enrichen Defendants iaedp and Harken by abusing the instrumentalities of a 501(c)(3) organization and the 501(c)(6) status of the "independent" iaedp corporate chapters.

**108.**    Save for three (3) corporate chapters[7], each of the twenty-nine (29) "independent" corporate chapters organized in the State of Illinois by Defendant Harken have the same Board of Directors. That is, Defendant Harken, Defendant Cabrera, Defendant Carson and Defendant Jahraus. These defendants also recently served as high-ranking officers of Defendant iaedp.

**109.**    Defendant Cabrera served as president of Defendant iaedp, and past-president and is on the executive board of Defendant iaedp. Part of Defendant Cabrera's job duties included signing the Annual Reports filed with the Illinois Secretary of State for the "independent" iaedp corporate chapters. As such, Defendant Cabrera had actual knowledge that each "independent" iaedp corporate chapter had the same board of directors and were completely subservient to the whims and demands of Defendants Harken and iaedp. Defendant Cabrera actively participated in the civil conspiracy by reviewing each Annual Report, signing and attesting to the accuracy of said reports.

**110.**    Defendant Jahraus serves as past-president of Defendant iaedp and is on the executive board of Defendant iaedp. Part of Defendant Jahraus' job duties include signing the Annual Reports filed with the Illinois Secretary of State for the "independent" iaedp corporate chapters. As such, Defendant Jahraus' has actual knowledge that each "independent" iaedp corporate chapter had the same board of directors and were completely subservient to his whims and demands as well as the demands and whims of his co-conspirators. Defendant Jahraus actively participated in the civil conspiracy by reviewing each Annual Report and signing said reports.

---

[7] These three chapters merely omit Defendant Carson. Otherwise, they are identical to the other chapters.

111.    Defendant Carson recently served as Treasurer of Defendant iaedp and is on the executive board of Defendant iaedp. Part of Defendant Carson's job duties include reviewing the Annual Reports filed with the Illinois Secretary of State for the "independent" iaedp corporate chapters and is tasked with overseeing the financial operations of Defendant iaedp. As such, Defendant Carson had actual knowledge that each "independent" iaedp corporate chapter had the same board of directors and were completely subservient to his whims and demands as well as the demands and whims of his co-conspirators. Defendant Carson knew or should have known that Defendant iaedp's resources and revenue were being denuded by Defendant Harken. And yet, Defendant Carson did nothing.  Defendant Carson actively participated in the civil conspiracy by reviewing each Annual Report and through acts and omissions, allowed Defendant iaedp's resources to be misdirected.

112.    Defendant Harken participated in the civil conspiracy by funneling revenue from Defendant iaedp, a 501(c)(3) organization, through a defunct, for-profit corporation formerly owned by Defendant Harken, and then to herself. As recently as September 2023, Defendant Harken was still making misrepresentations on iaedp's tax filings that her for profit corporation was in existence.

When Defendant Harken dissolved this for-profit corporation in 2016, she categorized herself as a sole proprietor and continued to receive revenue from iaedp. The purpose of the conspiracy was to cover up and hide Defendants Harken's agenda of prioritizing revenue for herself while presenting on the surface, a reputable eating disorder organization.

113.    Defendants' conspiracy to defraud was further perpetrated by significantly reducing their costs by employing all iaedp employees as 1099 entities, by

mischaracterizing the employment status of those alleged "independent contractors," by failing to pay state taxes due the State of California, by allowing the iaedp status in California to become not in good standing, by refusing to comply with the nonprofit organization laws in the states of California and Illinois and by and through their acts as previously set forth hereinabove. Defendant iaedp and Harken's other acts in furtherance of this conspiracy include, but are not limited to, the following:

A.   Agreeing on the substance of the scheme beginning in or about 2012 by utilizing a corporation to funnel money to herself from iaedp, a 501(c)(3) organization;

B.   Employing persons loyal to Defendant Harken by providing them upgraded suites and amenities at annual symposiums;

C.   Concealing their scheme and pattern of wrongful activity by intentionally providing false and incomplete information to Defendant iaedp's CPA for the purpose of falsifying information on iaedp's Form 990 tax filings;

D.   Wrongfully diverting revenue from iaedp to Defendant Harken so that she could financially profit from operating a competing therapy center named Crossroads Programs for Women;

E.   Permitting Defendant Cabrera to maintain certification status without paying the dues and fees required and without satisfying the maintenance requirements of iaedp.

**114.**   Defendants' acts originated, upon information and belief, in the States of Texas, California, Illinois, Missouri, New York and in all other states in which board-certified eating disorder specialists reside.

**115.**   All Defendants knowingly entered into an agreement whereby they failed to disclose to Plaintiff and the Plaintiff Class material information regarding the operations of iaedp, including but not limited to, diverting Plaintiff's and Plaintiff Class Members' monies to and for their own use. Acts in furtherance of this conspiracy were perpetrated

in the States of Texas, California, Illinois and in whatever states the Plaintiff Class resides. Therefore, Defendants agreed to accomplish either an unlawful act or a lawful act by unlawful means and specifically intended to harm Plaintiff and the Plaintiff class. Defendants had knowledge of the common object or purpose of the conspiracy and each of the individuals committed one or more wrongful acts in furtherance of the conspiracy.

**116.**   All Defendants intended to participate in the conspiracy and as a proximate result of such individuals' conduct or acts, Plaintiff and the Plaintiff Class sustained damages in a uniform amount, to wit: the amount of their annual dues and amounts paid in furtherance of obtaining board certification for which amount Plaintiff and Plaintiff Class herein sue. Moreover, Defendant Harken engaged in such conduct knowingly, willfully, maliciously and intentionally.   Therefore, Plaintiff and Plaintiff Class are entitled to recover punitive damages in an amount to be determined by the trier of fact.

<u>COUNT FIVE</u>

**<u>Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 <i>et seq.</i></u>**

<u>BACKGROUND FACTS AND CLAIMS RELATED TO VIOLATIONS OF the FEDERAL RACKETEERING STATUTES</u>

<u>A.      The RICO Enterprise</u>

Plaintiff incorporates paragraphs 15 – 116 as if set forth verbatim.

**117.**   Defendants, individually through their own actions, conduct and failure to act, and through their joint conspiracy operated and engaged in legitimate and illegitimate activities, including the racketeering activities herein alleged which such activities caused damage to Plaintiff and the Plaintiff Class.

**118.**   Defendant Harken, as Managing Director and Defendants Cabrera, Carson and Jahraus through the authority vested in them in the capacities as former officers and

current board members of the "independent" iaedp corporate chapters, were at all relevant times operating Defendant iaedp as a single enterprise and its rights, obligations, employees, contractors, agents and assets were routinely commingled and transferred and utilized by Defendant Harken without fair consideration to Plaintiff and the Plaintiff Class. Upon information and belief, Defendant Harken controls all aspects of the financial status of iaedp because she has signatory authority on all bank accounts in which iaedp has any interest.

**119.**   At all times relevant to this Complaint, Defendant Harken, in conspiracy with the other defendants, exercised dominion and control over the conduct and activities, both legitimate and illegitimate, of herself and the operations of iaedp. Decisions concerning both the illegitimate and legitimate conduct of the enterprise operated by Defendant Harken were made by Defendants Harken, Cabrera, Carson and Jahraus with constituted the approval and/or acquiescence of Defendant iaedp.

**120.**   As such, Defendant Harken violated 18 U.S.C. § 1962(a) by, " ... receiv[ing] any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

**121.**   At all times relevant to this Complaint, Defendant Harken violated 18 U.S.C. § 1962(c) by, "... being associated with an enterprise engaged in or the activities of which affect interstate or foreign commerce to conduct or to participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity.

**122.**   At all times relevant to this Complaint, Defendants Harken, Cabrera, Carson and Jahraus violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C § 1962(a) and 18 U.S.C. § 1962(c).

**123.**   A RICO Act claim under 18 U.S.C. §§ 1962(a), (c) and (d) requires a plaintiff to prove the following:

  (1).    A person engaged in;

  (2).    A pattern of racketeering activity connected to;

  (3).    The conduct or control of an enterprise.

Persons

**124.**   Defendants Harken, Cabrera, Carson, Jahraus and iaedp qualify as "persons" under 18 U.S.C. § 1961(3). Each of Defendants Harken, Cabrera, Carson and Jahraus and iaedp is an "individual or entity capable of holding a legal or beneficial interest in property" and as such, each constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

Racketeering Activity

**125.**   A "racketeering activity" as defined by 18 U.S.C. § 1961(1) includes, *inter alia,* any act which is indictable under 18 U.S.C. § 1341 (relating to mail fraud); 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1952 (relating to racketeering).

Texas Penal Code §32.45 – Misapplication of Fiduciary Property

**126.**   Defendants Harken and iaedp committed the racketeering activity of misapplying fiduciary property under Texas Penal Code § 32.45 and the crime is punishable with imprisonment for more than one year. To this end, Defendant Harken knowingly utilized iaedp as an instrument to further and accomplish their scheme by diverting monies from third parties, including but not limited, Plaintiff and Plaintiff Class Members through

Defendant Harken's defunct corporation and then, to herself. To cover up these illegal activities, Defendant Harken refused to allow any independent, third-party financial audit be conducted over the books, records and operations of Defendant iaedp.

**127.**    Contrary to iaedp's public representations, Defendant Harken solicited and accepted monies acquired through fraud by non-disclosure and misapplied monies to and for their own use. To this end, Defendant Harken received (not including payment of alleged expenses and bonuses) $617,000 from 2018 through 2021.

Texas Penal Code § 32.32. False Statement to Obtain Property

**128.**    Defendant Harken committed the racketeering activity of making false statements to obtain property under Texas Penal Code § 32.32 and the crime is punishable with imprisonment for more than one year.

**129.**    Defendant Harken knew that in order to increase her profits and revenue, she had to make board certification, association membership and attendance at a symposium inextricably intertwined. The largest money maker for Defendants iaedp and Harken was and is the annual symposium. To assure constant and growing attendance, Defendant Harken made in person attendance mandatory for board certification. In an affidavit filed in this case, Defendant Harken admitted that one of the reasons for the illegal tying arrangement was to have board certified specialists remain invested in iaedp.

Therefore, in order to continue to solicit revenue, iaedp maintained a façade of being an eating disorder research organization which embraced evidence-based, medical and mental health treatment for eating disorders. In truth, Defendant iaedp became *ipso facto*, an ATM to be utilized by Defendant Harken to enrichen herself with little or no accountability from any third parties.

**130.**   Defendant Harken knowingly utilized iaedp as an instrument to further her unethical and illegal agenda to accumulate revenue through the above-mentioned conduct.

Texas Penal Code § 32.42. Deceptive Business Practices

**131.**   Defendants committed the racketeering activity of engaging in deceptive trade practices under Texas Penal Code § 32.42. To this end, Defendants in the course of business intentionally, knowingly, recklessly, or with criminal negligence committed one or more of the following deceptive business practices: (7)  represented that a commodity or service is of a particular style, grade, or model if it is of another.

**132.**   In order to continue the illicit revenue flowing to Defendants Harken without having to be accountable for their illicit conduct, no Defendant authorized to have an independent, third party audited financial statement prepared for iaedp or any of the corporate chapters.

All Defendants engaged in conduct designed to maintain 100% control over the "independent" iaedp chapters. Defendant Harken, despite having actual knowledge that iaedp's tying arrangement was unlawful, continued to enforce its unlawful enforcement. All the while, all Defendants were maintaining the façade that iaedp was a reputable organization which continued to embrace and support evidence-based, medical and mental health treatment for eating disorders. Therefore, all Defendants specifically represented that Defendant iaedp was an organization of a particular style, grade or model when it was of another.

Wire Fraud – 18 U.S.C. § 1343

**133.**   All Defendants devised a scheme or artifice to defraud by means of wire, radio or television communication in interstate and foreign commerce. By reason of the conduct

described hereinabove, all Defendants violated, are violating, and continue to violate 18 U.S.C. § 1343 on an on-going basis by engaging in and facilitating a scheme and artifice to defraud and obtain money or property by means of false or fraudulent representations with the intent to defraud, and, in so doing, use interstate or foreign wire communications.

**134.**   All Defendants engaged in conduct having a substantial impact upon interstate commerce, including by, among other methods, soliciting and accepting membership payments, certification payments, payments from "independent" iaedp corporate chapters from Plaintiff and the Plaintiff Class and third parties residing throughout the United States, selling services in interstate commerce, entering into contracts with the Plaintiff Class Members which involve the movement of services in interstate commerce, and entering into agreements affecting interstate commerce.

**135.**   Defendant Harken obtained and used the proceeds of the racketeering activity herein alleged in and for the promotion of all Defendants' conspiracy and scheme to enter into arrangements providing ill-gotten revenue to Defendant Harken. Defendant Harken illegally exercised dominion and control over payments, fees and dues from Plaintiff and the Plaintiff Class.

<u>Mail Fraud – 18 U.S.C. § 1341</u>

**136.**   All Defendants devised a scheme or artifice to defraud by means of soliciting payments utilizing the United States Postal Service. Defendants' scheme further utilized the United States Postal Service by transferring and accepting revenue in interstate and foreign commerce. By reason of the conduct described hereinabove, all Defendants violated, are violating, and continue to violate 18 U.S.C. § 1341 on an on-going basis by engaging in and facilitating a scheme and artifice to defraud and obtain money or

property by means of false or fraudulent representations with the intent to defraud, and, in so doing, use interstate or foreign communications.

<u>Monetary Transactions Derived from Unlawful Activity – 18 U.S.C. § 1957.</u>

**137.**   Defendant Harken knowingly engaged in monetary transactions in criminally derived property (false statements to obtain property, deceptive business practices, fraud) of a value greater than $10,000 in the United States.

Enterprise or Association in Fact

**138.**   All Defendants participated in an enterprise or association in fact. Each Defendant participated in an on-going organization and each associate functioned as a continuing unit. The individual defendants and iaedp, the organizational entity run by Defendant Harken associated together to commit several criminal acts as set forth hereinabove which gave their association an ongoing nature allowing it to come within the purview of the RICO Act.

**139.**   Defendants, their agents and co-conspirators formed an association in fact for a common purpose of committing financial fraud perpetrated against Plaintiff and the Plaintiff Class. All defendants associated together to commit numerous acts constituting financial fraud over several years and their acts are on-going.

**140.**   The specific predicate acts perpetrated by Defendant Harken include, but are not limited to the following:

(a). They were all done by or at the direction of Defendant Harken, with the approval and/or acquiescence of the remaining Defendants for their benefit and the personal benefit of Defendant Harken;

(b). The illegal conduct and actions were all perpetrated by Defendant Harken outside of the scope of the legitimate authority of their office or employment and/or for their personal benefit;

(c). The illegal conduct and actions were all directed at Plaintiff and the Plaintiff Class in such a manner as to cause Plaintiff, the Plaintiff Class and third parties ultimate harm or injury;

(d). The illegal conduct and actions all relate to each other as part of a common course of conduct, plan, and objective to engage in a continued and concerted course of conduct with the purpose and effect of defrauding Plaintiff, the Plaintiff Class and third parties;

(e). The illegal actions and conduct all shared common methods in that each were committed by and under the direction of Defendant Harken;

(f). The illegal actions and conduct all included acts of concealment, fraud by non-disclosure and/or coercion, the illegitimate economic effect of which was the diversion of financial resources toward Defendant Harken and her competing for profit businesses;

(g). The illegal actions and conduct had sufficient continuity and duration in that they occurred from 2012 to date current, and;

(h.) The illegal actions and conduct each pose a threat of on-going repetition against Plaintiff and the Plaintiff Class.

**141.** These facts establish a period of repeated conduct that began as early as 2012 and are still on-going. These facts also establish that without this litigation and an award of relief, Defendants' illicit and illegal conduct will continue. To this end, prior to filing litigation, these matters were brought to the attention of the Board of Directors of iaedp.

The Board at best, only conducted a cursory investigation and through prior counsel, admitted that many of the errors and wrongdoings brought to their attention were in fact, accurate.  However, the Board of Directors took no action against Defendant Harken.

**142.**   As a result, Defendant Harken engaged in a misinformation campaign directed to the "independent" iaedp corporate chapters, including but not limited to, advising them not to be open to information which supported the allegations set forth in this Complaint.

**143.**   Plaintiff and the Plaintiff Class suffered and continue to suffer injury as a direct, proximate, and foreseeable result of the foregoing acts perpetrated by all Defendants. Accordingly, Plaintiff and the Plaintiff Class seek class certification and subsequent thereto, an award of actual damages, costs of this litigation, and reasonable attorneys' fees.

**144.**   Plaintiff and the Plaintiff Class seek treble damages pursuant to 18 U.S.C. § 1964(c).

### ALTER EGO

**145.**   Plaintiff incorporates paragraphs 15 – 144 as if set forth verbatim.

### Alter Ego

**146.**   The identities of Defendant iaedp and Defendant Harken are in substance one and the same. Defendant iaedp is but the alter ego of Defendant Harken, acting solely as a conduit for the performance of Defendant Harken's fraudulent business practices, and a device to cause harm or prejudice to those dealing with them, including but not limited to, Plaintiff and Plaintiff Class Members.

**147.**   Facts supporting alter ego allegations, include, but are not limited to the following:

      1.   Defendant Harken is the only 40 hour a week person employed by iaedp;

      2.   Defendant Harken is the Managing Director of iaedp;

3. Iaedp does not list any employees on its Form 990 tax filings;

4. Iaedp does not pay wages to any person pursuant to its Form 990 tax filings;

5. Defendant Harken is on the boards of directors of all corporate chapters of iaedp;

6. All corporate chapters utilize Defendant Harken's home address as their corporate address;

7. Defendant Harken utilized her home address and post office box as the contact information for the three (3) other directors on the corporate chapter's boards of directors;

8. Defendant Harken signs all iaedp's Form 990 tax forms as its managing director;

9. Defendant Harken keeps the corporate chapters informed of her positions on litigation;

10. As Chairman of the boards of directors of the corporate chapters, Defendant Harken controls all aspects of the continued operation of those chapters;

11. Defendant Harken utilizes social media on behalf of iaedp;

12. Defendant Harken schedules the dates of the annual symposiums conducted by iaedp.;

13. Defendant Harken employs her son in a highly paid position with iaedp;

14. Defendant Harken coordinates with iaedp's CPA and makes financial presentations to the iaedp Board of Directors;

15. Defendant Harken never authorized an independent, third-party financial audit performed for iaedp;

16. Defendant Harken is reimbursed for her expenses incurred as shown on iaedp's Form 990 tax filings;

17. Defendant Harken has been employed with iaedp for twenty-one (21) years (suggesting her employment is permanent);

18. Defendant Harken's work for iaedp includes all key components of iaedp's regular business;

19. Defendant Harken has signatory authority over all iaedp's bank accounts;

    20. Defendant Harken demands that when a chapter is in the process of dissolving, it pay over all monies owned by that chapter to iaedp, instead of another 501(c)(3) organization of that chapter's choice;

**148.**   Some of the most damning evidence of all was presented by Defendant Harken herself. In a sworn affidavit filed in this case, Defendant Harken admitted the following:

1. I am Managing Director of the International Association of Eating Disorder Professionals Foundation, Inc. ("iaedp");

2. I have been Managing Director since 2002, and am very actively involved in the iaedp, particularly with respect to its annual symposium;

3. Throughout my tenure at the iaedp, my duties and responsibilities have included among other things, to lead the organization according to decisions made and strategies developed with the board of directors, as well as protect and grow the organization's financial health, plan for upcoming initiatives and leadership of the initiatives within the organization, mentor new leadership, and create polices that ensure new strategies align with the organization's mission are put into action;

4. I primarily conduct business as Managing Director and operate the iaedp from my home in Pekin, Illinois;

5. All physical records related to the governance and management of the iaedp are stored at 1103 S. 5th Street,   Pekin, IL, 61554-4525;

6. All electronic records related to the governance and management of iaedp are stored in various storage platforms determined by purpose and access;

7. The principal place of business and headquarters of iaedp is Pekin, IL;

8. All physical records related to the governance and management of the iaedp are stored at 1103 S. 5th Street, Pekin, IL 61554-4525.

**149.**   With this legion of overwhelming and damning evidence, Defendant Harken still holds herself out to all third parties, including federal and state taxing authorities as an independent contractor of iaedp. To characterize this misclassification as fraudulent would be charitable.

**150.**   It is inequitable to recognize organizational and corporate shells through which an individual defendants can perpetrate her acts of conspiracy, fraud and criminal conduct. Plaintiff requests the Court to pierce the thinly veiled organizational shield erected by Defendant Harken and hold her individually liable for all perpetrated conduct as set forth above.

<u>**REQUEST FOR TRIAL BY JURY**</u>

**151.**   Plaintiff and the Plaintiff Class hereby request a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiff, individually and on behalf of others similarly situated, respectfully request that all Defendants appear and answer herein, and that the Court grant the following relief:

1.   Assume jurisdiction over Plaintiff's claims and the claims of the Class Members;

2.   Certification of this case and the claims for class treatment, with the class defined as set forth in this complaint;

3.   Designate Plaintiff as representatives for the class;

4.   Designate the undersigned as counsel for the class;

5.   Find that the tying arrangement set forth hereinabove violates provisions of the Sherman Antitrust Act and to make provisions to have the Board Certification process divested from iaedp;

6.   Find that Defendant Harken was unjustly enriched as a proximate result of their illegal and criminal conduct;

7.   Declare that Defendants entered into an illegal civil conspiracy;

8.    Declare that Defendants violated the afore-mentioned sections of the Racketeer Influenced Corrupt Organizations Act;

9.    Declare that Plaintiff and the Class Members sustained actual damages as a proximate result of Defendants' conduct;

10.    Return to Plaintiff and the Plaintiff Class all monies paid to iaedp from January 1, 2017, to present;

11.    Award to Plaintiff and the Class Members their actual damages as a proximate result of Defendants' conduct;

12.    Award to Plaintiff' counsel all reasonable and necessary attorney's fees incurred prosecuting this action;

13.    Award to Plaintiff treble damages;

14.    Award to Plaintiff exemplary damages,

15.    Hold that Defendant Harken utilized iaedp as a thinly veiled organizational alter ego and hold her personally liable for all illicit, illegal and improper conduct perpetrated by iaedp, and;

15.    Award such other relief, at law or in equity, as the Court deems just and proper.

Respectfully submitted,

*Steven Dunn*

Steven R. Dunn
State Bar No. 06252250
5830 Preston Fairways
Dallas, Texas 75252
Telephone (214) 769.7810
*steven@dunnlawfirm.net*

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*Steven Dunn*

Steven R. Dunn

Steven R. Dunn